IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 18, 2015 Session

## STATE OF TENNESSEE v. GERALD DAVIS THOMAS

**Appeal from the Criminal Court for Loudon County**
**No. 10794     E. Eugene Eblen, Judge**

---

**No. E2014-01157-CCA-R3-CD – Filed March 28, 2016**

---

The Defendant, Gerald Davis Thomas, was convicted by a Loudon County jury of one count of first degree premeditated murder. The trial court sentenced the Defendant to life imprisonment, which was to be served consecutively to a separate federal sentence. In this appeal, the Defendant raises the following issues for our review: (1) whether the evidence is sufficient to sustain his conviction for first degree premeditated murder; (2) whether the State engaged in improper closing arguments; (3) whether the trial court erred in allowing expert testimony regarding a forensic ballistic match; (4) whether the admission of the victim's autopsy report violated his right of confrontation; (5) whether the State failed to produce potentially exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963); (6) whether trial counsel was ineffective; and (7) whether the trial court erred in denying his motion for additional DNA testing.[1] Upon our review, we dismiss without prejudice the Defendant's claim of ineffective assistance of counsel. We also remand this matter to the trial court for entry of an order for additional DNA testing; specifically, the interior of the FUBU pants alleged to have been worn by the Defendant on the night the victim was killed and the substance recovered from underneath the victim's nails. In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Reversed in Part and Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Rosana Brown (at motion for new trial hearing) and Cashauna C. Lattimore (on appeal), Knoxville, Tennessee, for the Defendant-Appellant, Gerald Davis Thomas.

---

[1] We have re-ordered the issues presented for clarity.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; J. Scott McCluen, District Attorney General; and Frank Harvey, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On February 17, 2004, Jerry Monger, an employee with the Loudon County Highway Department, was cleaning ditches along Eblen Road and discovered the unclothed body of Adwinna Pamela (Pam) Hughes, the victim in this case. Following an investigation, the Loudon County Grand Jury indicted the Defendant on one count of first degree premeditated murder. During the Defendant's three-day trial, Detective-Lieutenant Jim Widener of the Blount County Sheriff's Department testified that the victim's body had a pair of sweat pants draped over her left foot and a sweat shirt pulled up over her head. The victim's chest area and the torso of her body had suffered massive injury and her left breast had been completely removed from her body. Detective Widener collected evidence from the scene, including the victim's clothes. He noted that the victim was wearing one shoe and the other shoe was located about three feet away. The victim's sock and shoes "had soil and dirt along the heel" like "[they] had been drug along on the dirt." There were also two holes in the upper left quadrant of the victim's breast that penetrated into the body and scrapes and bruising along back of the victim's neck. Two small, round wounds appeared on the victim's back upper shoulder area that resembled gunshot entrance or exit wounds. Detective Widener returned to the crime scene the next day and found two .45 caliber casings about halfway between the road and where the body was found.

On cross-examination, Detective Widener testified that he did not investigate the roadside or search for tire tracks. He also agreed that he did not find any evidence of blood loss in the area between the road and where the victim's body was found.

Officer Clifford Aaron Helton of the Roanoke City Police Department in Roanoke, Virginia, testified that, on February 18, 2004, at around 10:30 p.m., he received information about a Honda with Tennessee Tag number JPN-611, a description of the victim's car, which was wanted in connection with a homicide investigation in Tennessee. He was told that the car was parked at a Ramada Inn on Franklin Road and was given the name "Gerald Thomas." Using this information, officers set up a perimeter around the Ramada Inn and stayed inside a hotel room until the next morning. At approximately 10:20 a.m., Officer Helton saw the lights on the Honda flash and heard from perimeter units that a black male was coming down a stairwell toward the car. He then saw the Defendant walk into the parking lot. Officers announced their presence and ordered the Defendant to show his hands and get on the ground, and the Defendant complied. They secured the Defendant as well as a female, later identified as Michelle

Tolley, who had followed him out of the hotel, and took them both into custody. When Officer Helton looked inside the Honda, he saw the butt of a pistol in the pocket of a jacket on the driver's seat. On cross-examination, he agreed that the car doors were shut when he secured the Defendant.

William Henderson, a Special Agent with the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), testified that he was asked to assist local law enforcement in securing the Defendant. On February 19, 2004, he travelled to the Ramada Inn on Franklin Road in Roanoke, Virginia, and saw the victim's green, 2001 Honda Civic in the parking lot. He noted that the area around the car as well as Room 207 of the hotel had been secured and that he had obtained a federal search warrant for the room and car.[2] During a cursory search of the car, officers found a Springfield Armory, model 1911-A1, .45 caliber semi-automatic pistol bearing serial number N461144, which was loaded with seven cartridges of ammunition. Agent Henderson testified that the pistol was inside a black paddle holster in the right pocket of a black leather jacket on the front driver's seat of the car. Also inside the car on the back passenger's seat were two Winchester nine-millimeter caliber cartridges and one Winchester .45 caliber cartridge. The pistol and additional cartridges were secured, and the car was marked with crime scene tape and towed away. On cross-examination, Agent Henderson testified that he obtained a search warrant "based on the totality of the facts and circumstances," which included an interview another ATF agent conducted with Michelle Tolley. He acknowledged that he had no personal contact with Tolley and was not present during her statement.

Joni Crisp Seratt, an investigator with the Loudon County Sheriff's Department, testified that on February 20, 2004, she and two other crime scene investigators conducted a search of the victim's green Honda Civic. During the search, they removed a paper bag from the driver's seat that contained a full-length men's leather coat and three caps. They found a Winchester .45 caliber live round in the right front pocket of the coat. They also located another Winchester .45 caliber live round in the front console of the car and a Winchester nine-millimeter round in the center rear floorboard. From the trunk, they recovered various rounds of ammunition inside a blue converse bag, along with various articles of clothing, including a Harlem Globetrotters sweat suit and pair of pants.

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox County, Tennessee, testified as an expert in forensic pathology. Before becoming Chief Medical Examiner, she was the Assistant Chief to Dr. Sandra Elkins for five and a half years and

---

[2] Although the Defendant's race as African American is not in dispute, due to the racial epithets left on the victim's voicemail messages, we are compelled to note that the federal search warrants describe him as a white male.

they shared the responsibility of conducting autopsies for over twenty surrounding counties. Upon the State's request, she reviewed the autopsy report Dr. Elkins prepared for the victim. She also reviewed the diagrams, notations, photographs, x-rays, and slides Dr. Elkins prepared during the autopsy along with the information from the crime scene investigation. Upon her review, Dr. Mileusnic-Polchan was able to render an expert opinion regarding the victim's injuries and cause of death. She testified that there were four main types of injuries:

> The first group [was] strangulation related injuries and multiple gunshot wound[] injuries. I grouped them in one category because I consider them as the kind of main and contributing cause of death.

> The second group of injuries was sharp force injuries and the blunt force injuries. Blunt force injuries were not necessarily deadly when they occurred but they did occur when the victim was alive.

> . . .

> The sharp force injury, most of them and they are pretty extensive, appear to be postmortem, meaning that they were sustained when the victim was already dead.

She noted that the marks on the neck and the hemorrhages on the eyes and tongue indicated that the victim was alive when the strangulation occurred.

Dr. Mileusnic-Polchan further testified that three gunshot wounds were found during the autopsy even though a large portion of the skin from the left side of the victim's body was removed through post-mortem mutilation. Two gunshot wounds were located on the mutilated part of the victim's body in the area of the left chest and right abdomen. The third gunshot wound was located on the victim's left arm. An x-ray of these wounds showed that one bullet was located in the right upper chest area. Dr. Mileusnic-Polchan noted that examiners found an exit wound that matched the entrance wound to the victim's abdomen, but that no exit wound was identified on the victim's left arm. Examiners then tracked the entrance wound on the victim's arm using a "bullet probe," but no bullet was found.

Dr. Mileunsic-Polchan then described the mutilation of the victim's body as follows:

> As I already mentioned that the left side of the body involving the shoulder area, kind of diagonally all across the abdomen involving the

- 4 -

clavicle all the way down and basically the entire left breast area region was missing.

The margins of the wound were sharp. Meaning it was definitely a sharp object. One might argue that, you know, could it be animal predation because her body was discovered in a remote location in the woods with clothes in disarray, with no clothing items, but . . . there was no evidence of any animal predation. This was actually an action of a sharp object cutting the skin and introducing sharp well defined even margins. And the margins didn't show any evidence of bruising or abrasions. No evidence of vital reaction or bleeding, meaning that that particular injury, a large missing portion of the skin including the left breast region was done postmortem.

Associated with this particular injury there were multiple cuts in the ribs. The left ribs. There was a complete cut in the front portion of the sixth rib. We count them from top to bottom. The sixth rib was completely severed and then ribs seven, eight, and nine had nicks in them . . . produced by a sharp object. So they were like nicks in the cartilage. So why the ribs were cut - easily cut, well the explanation is understandable if you know that the boney part of the rib is going to be in the back and the side. And toward the front the ribs become cartilage. And cartilage is very soft and can easily be cut with almost any sharp object.

So in cartilaginous part of the rib in the front we had the complete cut of the sixth rib and nicks on the seventh, eighth, and ninth rib. And also there was a cut on the neck area right there where I described the ligature . . . pattern on the right neck. There was a superficial cut in the left neck region.

Dr. Mileusnic-Polchan agreed with Dr. Elkin's conclusion that the main cause of death was a combination of multiple gunshot wounds and strangulation. She further opined that the strangulation occurred prior to the shooting. She determined that remaining shock and blunt force injuries "were not contributory to the main cause of death," but that the bullet wounds were fatal, particularly the wound to the victim's chest. She noted that items, such as bullets, that are recovered during an autopsy are turned over to investigating officers and that it was a routine practice to provide officers a blood sample from the victim of a suspected homicide. She felt confident in rendering an expert opinion regarding the direction from which the victim was shot, noting that this determination depends on "the relationship between the entrance [and] exit [wounds] or [the] entrance [wound] and the recovered bullet." She said that the location of the victim's wounds and the injuries to the victim's organs "shows the directionality

- 5 -

basically from left to right, front to back and upward . . . [a]nd it's [a] relatively steep upward course." She said that given the upward angle and the condition of the victim's body when it was discovered, "[w]e would conclude in this case that . . . she was on the ground . . . laying down" when she was shot.

On cross-examination, Dr. Mileusnic-Polchan testified that, as reflected in the autopsy report, the victim's blood had tested positive for Ecgonine Methyl Ester, which is the "the breakdown product of cocaine." She confirmed her belief that the victim was most likely strangled and then shot while lying on the ground, but she agreed that this was not the only possibility. She explained that the strangulation could have occurred face-to-face or from behind because it was a "ligature strangulation[,] meaning that there was an object around the neck." She opined that "some sort of cloth" was used to strangle the victim given the nature of the victim's injuries. She stated death by strangulation generally happens within three to five minutes. She agreed that the mutilation to the victim's body could have been done with a sharp object such as a knife, razor, or scissors, but noted that the object must have been large "because the cuts are deliberate, wide with not much hesitation along the margin." She also said that victim's wounds were consistent with a medium caliber projectile bullet.

Michelle Tolley testified that she and the Defendant were taken into custody after exiting the hotel room in Roanoke, Virginia, on February 19, 2004. She first told law enforcement that her name was Nicole Price because she had a warrant for her arrest in Tennessee and admitted that she had previously used other aliases to avoid arrest. She initially denied knowing anything about the victim's death and explained, "I was scared because I just saw [the Defendant] kill a girl and I was scared because he still had a gun on him. I was scared because I had warrants out on me in Tennessee." She also confirmed that she had an extensive criminal record, including prior felony convictions for failure to appear, forgery, criminal impersonation, escape from jail, burglary, theft, and various drug-related offenses. She said that she had been addicted to crack cocaine during the period of her criminal conduct, but that her drug use stopped after she and the Defendant were arrested.

After Tolley was released from custody, she was interviewed by Lieutenant Jeff Vittatoe. She admitted that she did not tell him the truth at first but that "[h]e stayed on me until I finally broke." Investigator Vittatoe reduced her statement to writing, and she was given the opportunity to review it. Prior to the victim's death, Tolley had known the Defendant for about a year and had purchased crack cocaine from him multiple times. In early February 2004, the Defendant picked her up from a house that belonged to a man named Keylon, who the Defendant claimed was his son. The Defendant told her that they had to go pick up four or five hundred dollars in Kingsport from the victim's house. Tolley stated that she did not know and had never met the victim before. She noted that

the Defendant was driving a green Honda Civic and that she had seen him drive it before but did not know to whom the car belonged. She said they drove to Kingsport and went to "some house in the projects," where she saw "a blonde[-]headed female," who the Defendant referred to as "Applebutter." She identified that woman as the victim.

Tolley testified that the Defendant and the victim went inside the house for ten to fifteen minutes. She saw the victim follow the Defendant out "telling him that she didn't want him taking the car." The Defendant told the victim he was going to take it anyway and that "she didn't need to get in the car," but the victim got into the backseat. The victim said that it was her car and did not want the Defendant to drive it from the house. According to Tolley, the victim said she would drive them where they wanted to go. Tolley then told the Defendant to take her back to Johnson City "until all this drama got resolved." Tolley agreed that a dispute arose between the victim and the Defendant, during which the Defendant questioned the victim numerous times about having relations with another man. The Defendant drove away while he and the victim continued to argue. Tolley said that they stopped at Wendy's and then took the interstate to Knoxville where they went "to pick up dope" at a place "[o]ff Haskell Exit[.]" The Defendant went inside for about five minutes while the two women waited in the car. When he returned, they began smoking crack and drove around Loudon County. Tolley said that the Defendant became high and that he "just told [the victim] that he didn't know why she got in the car and now she had to die." Tolley said that she and the victim had "never [seen] that side of [the Defendant]," so they "just brushed it off."

Tolley further testified that the Defendant eventually exited the interstate onto a road that was wooded on both sides. She said that the road came to a dead end at a T-intersection, and that the Defendant turned the car around, drove back down the road, and parked. She said that the Defendant got out of the car to smoke a cigarette and spontaneously told the victim "it['s] time." The Defendant pulled the victim out of the car and took her on the side of the road. The Defendant and the victim were about ten feet from the car, and Tolley stayed inside the car until she heard multiple shots fired. She turned her head and heard the Defendant call her name, but she locked the door and did not respond.

Tolley further testified that about five minutes after she heard the shots, the Defendant returned to the car without the victim. She said that he got into the driver's seat and told her not to open her mouth. Tolley said that the Defendant told her that the victim was "still breathing[.]" It did not occur to Tolley to drive off or run away because she was scared and because the Defendant had just shot the victim. Tolley observed fingernail marks on the Defendant's right hand when he returned and that before leaving the scene, he held his hands outside the car and washed them with a soda that was in the center console. At that point, it was dark outside, and the Defendant drove them to a

hotel in Knoxville.  When they arrived at the hotel room, the Defendant checked the voicemail messages on the victim's cell phone.  Tolley also stated that the Defendant did not tell her why he shot the victim, and simply stated, "he had to do it, he did what he had to do."  Tolley stayed at the hotel with the Defendant because she was scared and did not want the same thing to happen to her or her family.

Tolley testified that they stayed at the first hotel for one night, stayed at a different hotel the next night, and then they drove to a Motel 6 in Roanoke, Virginia.  She said that they broke into cars and used stolen checkbooks to get extra cash.  She said that they stayed at four different places until the final stop where she and the Defendant were arrested.  She claimed that they were moving around because "I was wanted by the law and he just killed [the victim] so he just wanted to [be] on the move."  Tolley further stated that she and the Defendant stayed at the Ramada Inn in Roanoke for two nights.  During that time, the Defendant checked the messages on the victim's cell phone again, and there was a message from the victim's mother saying that "the police had found a body and it sounded like it was the victim."  Tolley said that there was another message "from [the victim's] boyfriend or something cussing her and calling her a crack head and threatening to harm her."  She stated that the person that left the message was angry and threatened to kill the victim and noted that there were no threatening messages on the victim's phone when the Defendant initially checked the victim's voicemail.  After hearing these messages, the Defendant destroyed the cell phone and told Tolley "that they found the [victim's] body [and] that we need to go."  When they exited the hotel room, they were met by law enforcement.

On the night the victim was killed, the Defendant was dressed as follows:

> He had on a pair of dark color Fubu pants, carpenter style.  He had on [a] pair of black and white Nike's.  He had on a black button up shirt with two pockets with a little buckle on each pocket.  He had on a Raider's hat, a black one and a brown . . . Carhart jacket.

Tolley said that the victim was wearing a pair of blue Harlem Globetrotter sweatpants with white and red stripes down the leg.  Tolley also identified at trial a photograph of a black leather jacket that the Defendant had purchased at a mall in Virginia.  She confirmed that the Defendant had a gun in the car and that she saw the gun after the victim was shot.  She also noted that it was common for the Defendant to carry a gun and that she had previously seen the Defendant with that particular gun.  She said that the Defendant had stolen the gun the month before, when he broke into the home of a man named Eugene Cummings.  Tolley admitted that she knew Cummings because she had previously done sexual favors for him in exchange for crack cocaine.  She claimed that she took the Defendant to Cummings's house to buy drugs, but he was not home so the

Defendant "kicked his door in and took his gun and some change and . . . some checks." Tolley admitted that she did not tell Investigator Vittatoe or anyone else about the burglary prior to trial because she was concerned that she would be charged for it.

On cross-examination, Tolley admitted that her criminal history demonstrated that she had been untruthful, and she acknowledged that she had lied to the court in prior criminal proceedings as well as to law enforcement in the present case. She also admitted that she fled from law enforcement in Roanoke, Virginia, after being released from custody. Tolley said that she "wanted away from the whole situation" and fled to her mother's house because she did not feel safe with law enforcement and was afraid of being arrested. She emphasized that her criminal conduct occurred while she was a drug addict. She also confirmed that following the victim's murder, she was frightened but that she nonetheless continued using the alias "Nicole Price." She also agreed that the Defendant had never actually threatened to shoot her. She further conceded that, during the time between the victim's murder and her arrest, she had made several calls to her family but never attempted to call 9-1-1. She admitted that she made no attempt to seek help for the victim.

On cross-examination, Tolley agreed that she was not under a threat of prosecution for the instant homicide when she made her initial statement to police on February 19, 2004. However, in her February 26, 2004 interview with Investigator Vittatoe, she was aware she could be charged with murder. She also admitted that even in the February 26 interview, she did not truthfully disclose where the Defendant's gun came from despite being specifically asked.

On re-direct examination, Tolley testified that the Defendant had met her family and knew where they lived. She noted that the Defendant was with her during the car break-ins and check forgeries in Virginia, had assisted her in carrying out these crimes, and had kept and handled the stolen money. She agreed that the Defendant never threatened to kill her, but she did not feel comfortable with attempting to leave. She further stated that she was unfamiliar with firearms and that, although the gun the Defendant took from Eugene Cummings looked like the one he had on the night of the offense, she was not absolutely sure it was the same gun.

Investigator-Lieutenant Jeff Vittatoe of the Loudon County Sheriff's Office testified that he was the lead investigator in the instant case. On February 17, 2004, he was called to a location about two miles off Interstate Highway 75 on Eblen Road. He noted that there was a T-intersection at the end of Eblen Road and that the crime scene was to the right of the road. Upon arrival at the scene, he checked the roadside for footprints and tire impressions, but did not find any. He explained that the general protocol for crime scene investigation involves photographing, cataloging, and packaging

items, which are sealed and initialed by the officer that collects them. He agreed that he took physical custody of all evidence collected from the scene. He also assisted in examining and moving the victim's body, which had been found in a mostly wooded area. He described the condition of the victim's body as follows:

> As you exit the roadway and start down the hill the body was . . . facing downhill face up with the feet pointing back towards the road. The shirt, like a sweat shirt, blue, had some red around the collar, was pulled up over the head and arm area. And was just - it was covering the head, it was still on the neck but pulled up off of the body itself, off of the arms. Legs of the pants pulled all the way off. One was off the foot. One, I think the left foot was still hanging on the edge of that foot and that one shoe was missing. I'm sorry the left shoe was off; the right was I believe the one that the pants were still on.
> . . . .
>
> You could see the obvious signs of what appeared to be a ligature abrasions around the neck area. And the shirt collar was just up above that around the chin area.

After the initial crime scene investigation, the Loudon County medical examiner approved the removal of the victim's body and issued an autopsy order. Investigator Vittatoe attended the autopsy the next morning on February 18, 2004, and he received the victim's blood sample from Dr. Elkins. He also observed the bullet being removed from the victim's body and closely examined the victim's wounds, particularly the cut marks on her ribs. He testified that he felt that these marks were very much "out of the ordinary," and he asked questions about the marks during the autopsy.

Investigator Vittatoe then testified that he travelled to Roanoke, Virginia, after the victim's car was found and the Defendant was taken into custody. He was present when Agent Henderson searched the victim's car and took possession of several items found inside the car, including the pistol that was found inside a jacket pocket. He noted that Captain Bill Shirk of the Loudon County Sheriff's Department transferred the evidence recovered from the victim's car to the TBI Crime Laboratory in Nashville. The car was then sealed and secured for transport and delivered to the Loudon County Justice Center. Investigator Vittatoe met with Investigator Seratt to discuss the results of her search of the victim's car, and all of the additional evidence removed from the car, including a pair of FUBU pants, was turned over to him.

Investigator Vittatoe interviewed Michelle Tolley about the victim's death. He could not recall whether he asked her about the Defendant's gun, but he agreed that he

did not ask her specifically about Eugene Cummings. He stated that he did not think Tolley had perpetrated the victim's murder. He also testified that he did not promise anything to her in exchange for her statement, put any words in her mouth, or tell her what to say. He acknowledged that he was "verbally hard" on Tolley but said that she was adamant that her final statement, which was reduced to writing, was the truth. He denied that he ever provided Tolley with information about the victim's clothing or the location where the body was discovered.

Investigator Vittatoe testified that the victim's phone records led him to the Defendant in Roanoke, Virginia. He confirmed that he had reviewed and recorded the threatening voicemail messages on the victim's phone. The caller in the voicemail stated that he lived at "310 Summer Street," and Investigator Vittatoe testified that there was no such address in Johnson City or Kingsport. On cross-examination, he testified that he retrieved the messages from the victim's phone during the week of February 20, 2004. He said that he would categorize the first two messages as "threatening" but stated that there was no information as to when the messages were left and who left them. He confirmed that he had access to the call log from the victim's cell phone, which consisted of four pages and 120 calls. He conceded that it was possible to match the threatening voicemail messages with the numbers listed on the victim's call log but that "it would be a process."

Investigator Vittatoe further testified that the call log indicated that somebody checked the messages from the victim's cell phone at 10:58 a.m. on February 19, 2004, shortly before the Defendant and Tolley were arrested. Investigator Vittatoe was unsure whether the messages were checked from the hotel phone but agreed that the "originating number" belonged to the victim's cell and that there were not Virginia numbers listed in the call log. He also said that the call log numbers were investigated "to a certain extent" but admitted that "I didn't take this [investigation] as far as I should have." He agreed that the voice on the threatening messages referred to the victim as "Wina". He also confirmed that a man who the victim knew named Will Pressley died of an overdose a few days after victim's death. Investigator Vittatoe was unsure whether Pressley's death was intentional or accidental. He further stated that "[a] lot of [Pressley's] previous activity was covered in the subsequent statements . . . taken from all the [victim's] friends," but he did not investigate Pressley further than that. He also confirmed that the gun and cartridges recovered from the victim's car were not tested for fingerprints. He noted that he had tried several times before to retrieve fingerprints from bullets but had never been successful. He agreed that Tolley did not state that she saw the Defendant with a knife, although knives were recovered from a gas station and from the victim's car and sent for DNA testing in relation to the victim's murder.

On cross-examination, Investigator Vittatoe also testified that he "press[ed]

- 11 -

[Tolley with] possibly be[ing] charged in this case." He agreed that he told Tolley she could be charged with murder in the present case even though he did not think she killed the victim. He also acknowledged that Tolley probably could have been, but ultimately was not, charged as an accessory to the victim's murder. He stated that he did not physically threaten her into saying things she did not want to say.

Special Agent Don Carmen, a Forensic Scientist at the TBI Crime Laboratory, testified as an expert in firearm identification, or "ballistics." He stated that in March 2004, he was asked to evaluate firearm items related to the victim's murder. He compiled an examination report that identified the items that were submitted for evaluation, which included: (1) a Springfield Armory semi-automatic pistol; (2) cartridges from the magazine that was inside the pistol; (3) a projectile bullet recovered from the victim's body; (4) two fired .45 caliber cartridge casings found at the crime scene; and (5) cartridges from inside the Defendant's coat pocket. Agent Carmen testified in detail about the process for firearm identification. Part of this process requires test firing bullets into a water tank, or "test tank," so that no markings are left on the projectile bullet other than "the barrel's signature." The cartridge case of each bullet fired from a particular firearm also contains unique markings known as a "mechanical fingerprint." A comparison microscope is used to examine the similarities between the markings that appear on two bullets to determine if they were fired from the barrel of the same firearm. Agent Carmen test fired bullets from the Defendant's pistol and compared them to the projectile bullet recovered from the victim along with the two cartridge casings found at the crime scene. He concluded that all of the bullets were fired from the Defendant's pistol.

Hunter Green, a Special Agent Forensic Scientist for the TBI, testified as an expert in serology DNA analysis. On March 4, 2004, Agent Green received a request to test various items of evidence for the presence of blood. These items included: (1) the victim's blue sweatshirt, blue jean jacket, blood sample, vaginal swabs and slides, and fingernail clippings; (2) the Defendant's buccal swabs, FUBU pants, shirts, jeans and jacket; (3) a switch blade found at Mr. Gas; (4) a brown Carhartt jacket recovered from the Ramada Inn; (5) various clothing, a wooden club, and a knife found inside the victim's car; and (6) samples taken from the pedals and upholstery of the victim's car. She said that she observed reddish brown stains on the right hand side of the FUBU pants just below the pockets. She performed testing on the stains and confirmed that it was the victim's blood on the pants.

On cross-examination, Agent Green agreed that not all of the evidence submitted to her was tested and that she did not test anything from the victim. She also agreed that no part of the Defendant's FUBU pants was tested other than the small cutting from the area containing the blood stains. She conceded that she did not know if the Defendant

had actually worn the FUBU pants. She acknowledged that there was "a good possibility there would have been enough [DNA]" to test whether the Defendant or someone else wore the pants.

On re-direct examination, Agent Green testified that she followed protocol by testing the "most productive" areas of evidence. She explained that given the heavy workload, forensic scientists follow a protocol for testing that allows them to reasonably process the items they receive. She stated that had defense counsel requested additional testing in the present case, she would have complied. On re-cross examination, she conceded that there are not enough resources to test every item of evidence received. However, she reiterated multiple times, "I did what our protocols allow us to do and again had I have been requested I would have done more."

Phyllis Eddington, the victim's mother, testified that the victim was forty-three years old and lived in Kingsport, Tennessee, when she died. Eddington lived in Knoxville but said that she and the victim stayed in close contact and spoke regularly on the phone. She was familiar with Will Pressley, a friend of the victim's for over fifteen years. She said that Pressley was kind to the victim, that she had never seen him be abusive, verbally or otherwise, and that the victim had never indicated that problems existed between them. She was unaware of whether the victim and Pressley were just friends or romantically involved and conceded that "[it] [c]ould have been both." Eddington stated that she spoke with Pressley on a fairly regular basis, both in person and on the phone. She agreed that she had listened carefully to recordings of two threatening voicemails from the victim's phone. She did not recognize the voice in these calls but testified that she was sure that it was not Pressley. On cross-examination, Eddington testified that although she had never heard Pressley's voice raised, she was confident that the voice heard on the victim's voicemail messages was not his.

Based on the foregoing evidence, the jury found the Defendant guilty as charged of first degree premeditated murder. The trial court imposed a life sentence to be served consecutively to a separate federal sentence. The Defendant filed a timely motion for new trial on June 9, 2008, and amended motions for new trial on January 7, 2014, and May 8, 2014.[3] During the pendency of his motions for new trial, he also filed a Motion for DNA Testing on August 22, 2013, followed by an amended motion on May 8, 2014. After a non-evidentiary hearing on May 12, 2014, the trial court issued an order denying

---

[3] The record does not provide this court with a reason for the nearly six-year delay between the filing of the motion for new trial and the resolution of the same. To this court's surprise, the amended motion for new trial was not heard until after the Defendant appealed the trial court's denial of his Amended Motion to Order Forensic DNA Testing. In response to his notice of appeal, this court ordered the full technical record, including the transcript of the motion for new trial, and discovered that the motion for new trial had languished in the trial court for six years.

the motion for DNA testing on May 22, 2014. A hearing on the motion for new trial took place on September 29, 2014, and the trial court issued a written order denying relief on October 2, 2014. After the denial of his motion for new trial, the Defendant filed a timely notice of appeal on October 29, 2014.

## ANALYSIS

On appeal, the Defendant raises seven issues. He argues that: (1) the evidence is insufficient to sustain his conviction for first degree premeditated murder; (2) the State offered improper closing arguments; (3) the trial court should have limited the expert testimony regarding a forensic ballistic match; (4) the admission of the victim's autopsy report violated his right of confrontation; (5) the State failed to produce potentially exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963); (6) trial counsel was ineffective; and (7) the trial court improperly denied his motion for additional DNA testing.

**I. Sufficiency of the Evidence.** The Defendant argues that the evidence was insufficient to sustain his conviction for first degree premeditated murder. The Defendant notes that the State "provided, for the first time during [closing] argument . . . the theory that the post-mortem mutilation of the victim's body was evidence of premeditation because . . . the perpetrator was trying to cover up his crime by trying to retrieve the slugs from the body." Aside from this unsupported theory, the Defendant claims the State failed to produce any evidence of premeditation. In response, the State contends that the evidence is sufficient to support the conviction of first degree murder. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." When considering the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009).

- 14 -

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two.  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).  The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'"  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).  The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence.  State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).  Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury.  Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)).  When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact.  Id.

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1).  Premeditation is defined as "an act done after the exercise of reflection and judgment."  Id. § 39-13-202(d).  This section further defines premeditation:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.  If the proof establishes that the defendant intended to cause the death of a person and that he acted with premeditation and deliberation, then the killing of another, even if it was not the intended victim, is sufficient to sustain a conviction for first degree premeditated murder.  State v. Ely, 48 S.W.3d 710, 723-24 (Tenn. 2001); Millen v. State, 988 S.W.2d 164, 168 (Tenn. 1999).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense.  State v. Young, 196 S.W.3d 85, 108 (Tenn. 2006); State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000).  Factors that may support the existence of premeditation include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the

infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction and secretion of evidence of the killing, and calmness immediately after the killing. State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009); State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted).

Aside from the mutilation theory posited by the State during closing argument, which the Defendant challenges in issue two, the Defendant argues that there was no proof offered at trial to support premeditation. We disagree. Viewed in the light most favorable to the State, the record shows that the Defendant took the victim's car against her wishes on the night she was killed. As they drove around, the Defendant and the victim were "fussing" over the car and the victim's relations with another man. The Defendant, the victim, and Tolley later engaged in illegal drug use. Toward the end of the night, the Defendant told the victim she had to die and drove to a remote, wooded area off Eblen Road in Loudon County. The victim was then "jerked" out of the car. The medical examiner testified that she was strangled while she was alive and shot multiple times. Tolley heard multiple shots fired and testified that the victim did not return to the car. Before leaving the scene, the Defendant washed his hands with a soda and instructed Tolley "not to open [her] mouth." The Defendant drove away in the victim's car with the victim's cell phone, leaving the victim's body in the woods. He later told Tolley that "he did what he had to do." In the days following the victim's murder, the Defendant checked the voicemail messages on the victim's cell phone multiple times before eventually destroying it. He moved to different hotels and fled the state. Based on the above proof, a rational juror could conclude beyond a reasonable doubt that the Defendant acted with premeditation to commit first degree murder of the victim. He is not entitled to relief on this issue.

**II. Prosecutorial Misconduct in Closing Arguments.** Related to his challenge to the sufficiency of the evidence, the Defendant argues that the trial court erred in allowing the State to argue in closing argument facts that were not in the evidence adduced at trial. Following the close of the State's case-in-chief, the Defendant moved to dismiss the first degree murder charge based on insufficient proof to establish premeditation and deliberation. The State responded that the post-mortem mutilation of the victim's body was proof of premeditation because it was an attempt to retrieve the bullets fired from the victim's body. The trial court denied the Defendant's motion for judgment of acquittal, and the Defendant moved to prohibit the State's use of this theory in closing arguments,

which was denied by the trial court.  The State's closing argument, in pertinent part, was as follows:

It has to be intentional.  Was this accidental?  Was this inadvertent?  One shot, two shots, three shots.  Strangulation while she was still alive.  At leas[t] prior to the fatal shot.  And then the mutilation, this was no accident.  This was no inadvertent killing, this was an intentional act.

It wasn't premeditated.  Premeditation can happen in an instant.  Once again the circumstances tell you a whole lot about this case.  Not one shot, not two shots, but three shots.  Strangulation as well.  And then what I submit to you was methodical mutilation.

There may be something to argue about premeditation based on just what's at the scene, but you are almost all the way there with just what you have just from that scene.

Could it have been done by someone who was angry[?]  [Y]es it could have been[.]

Let's talk a little bit about this mutilation.  When you first heard that she had been mutilated, I believe actually I mentioned that during jury selection, when you first heard testimony of that, did some of you think to yourself, just out of meanness.  Maybe out of desire to take home a gruesome trophy.  It's a logical place to go.

But I doubt if it was missed by at least some of you that there was testimony after that that tells you something different about that.  This was not just the excising of the superficial tissue of the breast.  Dr. Mileusnic told you (indiscernible).

What else did she tell you?  She told you that the ribs were cut in two.  Two totally severed.  Three she called superficial.  One of those superficial was almost a third of the way.  Almost half of the way through there.  Where did that go into the body cavity? (Indiscernible)

What else did she tell you?  Before they even make the first cut on the body they do x-rays.  She didn't have to tell you why they did that.  One of the ways to find foreign objects in the body.  There's other things that doctors can see in x-rays that you and I can't.  Something as vague as is that so in so (indiscernible).  But you've all seen your own dental x-rays

and what does metal do in a dental x-ray? It stands out, bright clear spot on the x-ray.

The Doctor told you that she was shot three times. (Indiscernible) with one exit wound and one projectile. The purpose, I submit to you of that mutilation was to recover the slugs, to recover evidence and it was partially successful. But there was still one slug in her.

Really this case boils down to only one issue. And that is that man over there that did it. That's it, period.

This is a first degree murder.

The Defendant argues that the State improperly offered testimony in closing arguments by introducing a theory of premeditation that was not supported by the evidence adduced at trial. He also claims that the trial court abused its discretion in permitting the State to do so. The State responds that its arguments were within the bounds of what the law allows and that the trial court did not abuse its discretion. We agree with the State.

Prosecutorial misconduct occurs when (1) the prosecutor intentionally misstates the evidence or misleads the jury as to the inferences it may draw or (2) the prosecutor intentionally refers to or argues facts outside the record unless the facts are matters of common public knowledge. See State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citations omitted). "Closing argument is a valuable privilege that should not be unduly restricted." State v. Stephenson, 195 S.W.3d 574, 603 (Tenn. 2006) (citing State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001)). Prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. Id. (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). The trial court has substantial discretion in controlling the course of arguments and will not be reversed unless there is an abuse of that discretion. State v. Sexton, 368 S.W.3d 371, 419 (Tenn. 2012) (citing State v. Thomas, 158 S.W.3d 361, 412-13 (Tenn. 2005) (appendix)). However, an attorney's comments during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" State v. Gann, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (quoting State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)).

In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996). This court must consider the following factors when determining whether

the argument of the prosecutor was so inflammatory or improper to negatively affect the verdict:

> (1) the conduct complained of viewed in the light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case.

State v. Chalmers, 28 S.W.3d 913, 917 (Tenn. 2000) (citations omitted).

The Defendant claims that the State engaged in prosecutorial misconduct by introducing a theory of premeditation based on the post-mortem mutilation to the victim's body. According to the Defendant, "[t]he [State's] introduction of that theory, without having proof in evidence of that fact, constituted reversible error designed to bolster the State's weak case for premeditation[.]" In allowing the State's closing argument at trial, the trial court determined that there were sufficient facts in evidence to support the State's theory. We agree. Here, Dr. Mileusnic-Polchan testified with regard to the mutilation to the victim's body, noting that it occurred post-mortem. She also determined that a sharp object was used, that the cuts on the victim's ribs were mostly superficial rather than intended to inflict injury, and that there were no signs of animal predation. Two of the victim's gunshot wounds did not have exits wounds, but only one bullet was retrieved from the victim's body. Given these facts, it was reasonable for the State to argue that the purpose of the post-mortem mutilation was to recover the bullets from the victim's body. Moreover, as we discussed in issue one, there was more than sufficient proof of premeditation in this case, including the Defendant's statements on the night the victim was killed that she was going to die, the fact that the victim was strangled while alive, and the fact that she was shot multiple times. Thus, to the extent that there was any error in the State's argument, we conclude that it was harmless. The Defendant is not entitled to relief on this issue.

**III. Ballistics Testing.** The Defendant argues that the trial court should have limited Agent Carmen's expert ballistics testimony at trial "to account for scientific and statistical impossibilities in the field." Specifically, he asserts that "Agent Carmen crossed the threshold of appropriate expert opinion" when he positively stated that the bullets recovered from the crime scene were fired from the Defendant's pistol. He notes that Agent Carmen "repeatedly stated that his testing revealed a <u>certain</u> ballistic match, ultimately inferring a match to the exclusion of all other weapons, and one of scientific certainty." The Defendant maintains that affirmative expert opinions regarding ballistics testing are not scientifically reliable and that the use of this type of testimony at trial was

therefore misleading and prejudicial. The State argues that the trial court properly admitted Agent Carmen's expert testimony. We agree with the State.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. Rule 702, which addresses the need for expert testimony and the qualifications of the expert, provides: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. The Tennessee Supreme Court defined the role of trial courts in determining the admissibility of expert testimony:

> Trial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. A court must assure itself that the expert's opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability.

State v. Scott, 275 S.W.3d 395, 401-02 (Tenn. 2009) (internal citations and quotation marks omitted). The witness's necessary expertise may be acquired through formal education or life experiences. Neil P. Cohen et al., Tennessee Law of Evidence § 7.02[4] at 7-21. However, the witness must possess such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise exceeds the scope of common knowledge and experience possessed by the average person. Id. (citations omitted).

Tennessee Rule of Evidence 703 provides guidance regarding the proper bases for expert testimony:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their

probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703 (emphasis added).

"Generally speaking, the trial court is afforded broad discretion in resolving questions concerning the admissibility of expert testimony; in consequence, we will not overturn its ruling on appeal absent a finding that it abused its discretion." State v. Ferrell, 277 S.W.3d 372, 378 (Tenn. 2009) (citing State v. Copeland, 226 S.W.3d 287, 301 (Tenn. 2007); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993)). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." Scott, 275 S.W. 3d at 404-05 (citing Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

The Defendant challenges the admission of Agent Carmen's testimony at trial to the extent that it presents an affirmative conclusion of a ballistic match "to a degree of scientific certainty." Relying on publications issued by the National Research Council, the Defendant asserts that the legal and scientific landscape has changed since his May 2008 trial and that "significant technological advancements have discredited the reliability of ballistic prints as a form of affirmative proof in criminal trials."[4]

At the motion for new trial hearing, the Defendant called Shelly Betts, a Special Agent Forensic Scientist Supervisor of the Firearms Units at the Nashville Crime Laboratory, to testify in place of Agent Carmen. Agent Betts reviewed the case file and the procedure Agent Carmen used to conduct the firearm examination, which was the same procedure used by all TBI agents. She explained that positive and negative controls were used in testing and that "[f]or the firearms part of the analysis, the control would be the knowns that were test fired from that pistol." She noted that they did not test fire

---

[4] The Defendant cites two publications from the National Research Council in his Memorandum in Support of Defendant's Amended Motion for New Trial and in the Defense Brief on appeal. See National Academy of Sciences, National Research Council, Committee to Assess the Feasibility, Accuracy, and Technological Capability of a National Ballistics Database, Ballistics Imaging 7-8 (2008), available at http://www.nap.edu/catalog/12162/ballistic-imaging; Committee on Identifying the Needs of the Forensic Science Community, National Research Council, Strengthening Forensic Science in the United States: A Path Forward 107-09 (2009), available at https://www.ncjrs.gov/pdffiles1/nij /grants/228091.pdf. For purposes of clarity, we will refer to these collectively as the "NAS Reports."

other pistols and that it was not necessary to test every firearm of that model because examiners instead look for the unique markings reproduced from a particular firearm. She further testified that it was possible to exclude all other firearms in the present case because the markings found on the test-fired cartridge casings and bullets were the same as the individual markings found on the cartridge casings and bullets recovered from the crime scene. She felt confident that another firearm would not have left the same markings, noting that examiners can affirmatively conclude that a ballistic match exists when there are a significant number of matching marks. She also noted that there is a weapon's database that allows firearm examiners to determine if a weapon has been used in a prior crime.

Agent Betts said that DNA and ballistic testing are not comparable in terms of measurability, as statistics are not the form adopted by the TBI for forensic evaluation of firearms. Defense counsel questioned how TBI determines "based on the large pool of weapons that are out there, that that is affirmatively the gun to the exclusion of all others that fired that bullet," and Agent Betts replied:

> I believe (indiscernible) the degree of scientific certainty implies that there is no way that you can look at every gun even of that same make and model to see if they have the same type of markings. So what we do, is we look at the best known non-matches which would be consecutively made with the same tool, same period of time. And you can see differences in all of those.
>
> There may be some similarities but to make that identification you have to have a sufficient agreement of matching stria which exceeds the best known non-matched and you are not talking about a one or two percent difference. There's a large difference in the best known non-match versus a match.
>
> When you found the significant number of matching stria to conclude a test from experience and from looking at thousands of non-matches, then you can conclude that that bullet or that cartridge was fired from that pistol or firearm.

Asked specifically "her opinion" about the Ballistics Imaging Report of 2008 discouraging efforts to establish a national ballistic print database due to statistical shortcomings in the field, Agent Betts replied, "that's trying to assign statistics to a pattern. That doesn't necessarily lend itself to specifics." Asked "her opinion" about whether "a 100% certain match can be established to a scientific certainty with regard to forensic ballistics matching," Agent Betts replied:

Again, it is not possible, like in fingerprints, to look at every person to see if they have the same fingerprint. What you can do is look at the guns that are going to be the most similar, that are going to leave the most similar markings, and that's been done repeatedly. I've done that myself. Everybody at the T.B.I.'s done that. That's why, to a scientific certainty, we are able to say that those bullets, or those cartridge cases, were fired in that gun if we make a positive identification.

On cross-examination, Agent Betts testified that TBI had a mandatory technical review process for every ballistics examination. She said that every examination is verified by a second examiner and then the entire case undergoes a technical review to ensure the methods and conclusions are valid. She also explained that the examiners are required to explain their conclusions using at least two of three methods, which include a narrative, a drawing, or a photographic representation. Agent Betts confirmed that all of the required TBI procedures were followed in the present case and that she was confident that the results yielded a ballistics match between the slug recovered from the victim's body and the Defendant's gun.

At the conclusion of the motion for new trial hearing, the trial court denied relief without elaboration. Upon our review, we reject this issue on several grounds. First, the Defendant concedes that he did not object to the admission of Agent Carmen's ballistic testimony at trial and explains that the science of ballistic testing had not yet evolved in 2008 to justify such an objection. We note, however, one of the reports upon which he now relies was published in 2008. In any event, our rules require that a timely objection be made to preserve an error and that a party take any action reasonably available so as to prevent an error. See Tenn. R. Evid. 103(a)(1); Tenn. R. App. P. 36(a). When a party does not object to the admissibility of evidence, this Court is limited to reviewing the issue for plain error. Tenn. R. App. P. 36(b).

In order for this court to find plain error, "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[P]lain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotations marks and citations omitted). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing United States v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete

consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

At trial, Agent Carmen explained how he conducts firearms examinations and generally stated, "[I]f I find sufficient agreement I can conclude 100 percent that that particular bullet has been fired down that barrel." Significantly, Agent Carmen was later asked if he was able "to a reasonable degree of scientific certainty determine whether that slug was fired through the [subject] pistol," and he replied, "Yes." Agent Carmen was also asked whether he "was able to determine to a reasonable degree of scientific certainty whether or not those cases had been fired in that weapon?" Agent Carmen replied, "Yes."

In support of this issue, the Defendant's brief relies heavily upon several federal district court opinions which have either limited the admissibility of a ballistic expert's opinion based on the 2008 and 2009 NAS Reports or limited the admissibility of ballistic testimony based on deficiencies in a ballistic expert's qualifications and background. See United States v. Willock, 696 F. Supp. 2d 536, 581-82 (D. Md. 2010); United States v. Taylor, 663 F. Supp. 2d 1170 (D. N.M. 2009); United States v. Monteiro, 407 F. Supp. 2d 351 (D. Mass. 2006) (allowing testimony of ballistics expert but limiting it to "a reasonable degree of ballistic certainty"); but see United States v. Casey, 928 F. Supp. 2d 397 (2013) (holding that concerns regarding reliability of AFTE theory of identification for ballistics evidence did not warrant limiting testimony of firearms experts because "the purpose of the 2008 NAS report was not to pass judgment on the admissibility of ballistics evidence in legal proceedings, but, rather, to assess the feasibility of creating a ballistics data base [and] . . . . the question of legal admissibility 'was explicitly ruled out[.]'").

The cases relied upon by the Defendant have no binding effect on this court. They are also distinguishable from the case sub judice. The most striking difference is that, in this appeal, Agent Carmen did in fact testify to a reasonable degree of scientific certainty as to his conclusions concerning the firearm and cartridges. In addition, the Defendant did not admit the NAS Reports into evidence, made only fleeting references to the reports at the hearing, and failed to provide any testimony regarding the importance of these reports to this case at the hearing on the motion for new trial. Although the Defendant attempted to challenge Agent Carmen's ballistic determinations at the motion for new trial, Agent Betts confirmed all of Agent Carmen's conclusions. Agent Betts also testified that the methods that Agent Carmen used in his examination of the bullets and pistol were widely accepted within the scientific community and remain the primary method of testing used by the TBI. While the Defendant makes somewhat sweeping conclusions in his brief condemning ballistic science, he has failed to meaningfully challenge the qualifications or methodology used by Agent Carmen to test the firearm,

bullets, and cartridges in this case.  Because no clear and unequivocal rule of law has been breached, this issue does not warrant plain error review.  See also State v. Lemaricus Devall Davidson, No. E2013-00394-CCA-R3-DD, 2015 WL 1087126, at *32-33 (Tenn. Crim. App. Mar. 15, 2015) (holding that expert testimony regarding ballistics matches is permissible and noting that "challenge[s] utilizing the conclusions in the National Research Council report 'more appropriately will go to the weight of the evidence rather than its admissibility.'").

**IV. Autopsy Report.**  The Defendant next contends that the trial court erred by admitting the victim's autopsy report into evidence.  Specifically, he argues that "the autopsy report prepared by Dr. Elkins, but testified to by Dr. Mileusnic-Polchan, is testimonial and its introduction without Dr. Elkins being available for confrontation violates [the Defendant's] Sixth Amendment right to confront the witnesses against him."  The State argues that the autopsy report is generally non-testimonial in nature and may be admitted into evidence without violating the Defendant's right to confrontation.

As in issue three, the Defendant failed to preserve this issue by making a contemporaneous objection to the admission of the autopsy report or an objection to Dr. Mileusnic-Polchan's testimony at trial.  Therefore, our review of this issue in limited to plain error analysis, subject to the same legal analysis as described in issue three.

We need not tarry long in resolving this issue because the sole case relied upon for relief by the Defendant has been abrogated by the United States Supreme Court.  See State v. James Drew Freeman, No. M2011-00184-CCA-R3-CD, 2012 WL 1656975 (Tenn. Crim. App. May 9, 2012), abrogated in part by Williams v. Illinois, -- U.S. -- , 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012), as stated in State v. Thomas Lee Carey, Jr., No. M2013-02483-CCA-R3-CD, 2015 WL 1119454 (Tenn. Crim. App. Jan. 14, 2015) (quoting State v. Jessie Dotson, No. W2011-00815-CCA-R3-DD, 2013 WL 4728679, at *66 (Tenn. Crim. App. June 25, 2013) ("[T]he Williams decision 'effectively abrogated this court's holding in James Drew Freeman, Jr. that the admission of an autopsy report prepared by a pathologist who does not testify at trial violates the Confrontation Clause.'")).  In addition, while this case was pending review in this court, the Tennessee Supreme Court squarely resolved this issue against the Defendant.  See State v. Thomas Lee Hutchison, -- S.W.3d -- , No. E2012-02671-SC-R11-CD, 2016 WL 164310 (Tenn. 2016).

In Williams, the United States Supreme Court held that the Confrontation Clause did not preclude an expert witness that was not involved in the preparation of a DNA laboratory report from providing an opinion based on information contained therein.  Williams, 132 S. Ct. at 2243.  The Court in Williams concluded that the report was non-testimonial because it was not prepared for "the primary purpose of accusing a targeted

- 25 -

individual." Id. The Court noted further that, at the time the report was prepared, no suspects had been identified and the purpose of the report was to catch a suspect who was still at large rather than "to accuse [the Defendant] or to create evidence for use at trial. Id.

Following Williams, the Tennessee Supreme Court reexamined the admissibility of autopsy reports prepared by a medical examiner who did not testify and the admission of testimony from a physician who did not perform the autopsy in State v. Dotson, 450 S.W.3d 1, 71 (Tenn. 2014). The Court noted that "[c]ourts continue to be divided on the question of whether autopsy reports are testimonial statements or not." Id. The defendant in Dotson argued that the admission of autopsy reports prepared by a medical examiner who did not testify at the trial and the admission of testimony from a forensic pathologist that did not prepare the reports violated his confrontation rights. Id. at 70. As in this case, the defendant in Dotson failed to object to the admission of the expert testimony or the information contained in the autopsy reports. Id. Further, neither the autopsy reports nor the testifying pathologist's testimony implicated the defendant in the homicides. Id. at 72. The Court concluded:

> We need not decide in this case whether autopsy reports are testimonial or whether a medical examiner may testify about an autopsy report produced by another pathologist who does not testify at trial. Instead we hold only that no clear rule of law was breached in this case by the admission of the autopsy reports or [the doctor's] testimony about them. Given the uncertainty that has existed in Confrontation Clause jurisprudence since Crawford, and in particular the lack of clarity regarding expert reports and testimony, which was actually exacerbated by the splintered decision in Williams, we conclude that the defendant has failed to establish that a clear and unequivocal rule of law was breached.

Id. (footnote omitted). Based upon the foregoing, the Court held that plain error relief was not necessary to do substantial justice. Id. We view this case no differently than Dotson. Accordingly, based on the reasoning and analysis applied in Dotson, we conclude that plain error relief is not necessary to do substantial justice.

**V. Brady Violations.** Next, the Defendant argues that the State committed Brady violations by presenting false testimony, withholding exculpatory evidence related to a third party suspect until one week prior to trial, and suppressing exculpatory DNA evidence. The State responds that the Defendant has failed to prove a Brady violation and is therefore not entitled to relief. We agree with the State.

- 26 -

**A. The State Presented False Testimony.** The Defendant first argues that "the State's key witness provided patently false testimony that was spawned by her fear of criminal prosecution, due to threats made by Detective Vittatoe." He maintains that "serious questions arose during and after trial regarding the veracity of the State's key witness, which, when considered together with the withheld third-party suspect information, resulted in a trial that was 'fundamentally unfair.'" According to the Defendant, the presentation of false testimony amounted to a Brady violation, and "the likelihood that perjured testimony was presented by the State supports the need for a new trial." Unfortunately, at the hearing on the motion for new trial and in his brief to this court, the Defendant failed to identify what testimony was false, failed to present any proof as to its falsity, and failed to demonstrate that the State was aware of any such falsity. See State v. Cureton, 38 S.W.3d 64, 74-75 (Tenn. Crim. App. 2000) ("To obtain a new trial [based on such a claim], the defendant must demonstrate that the State presented false testimony, the State knew the testimony was false, and the testimony was material."). Because the Defendant failed to present any proof regarding his claim of false testimony, it is waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); see also Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on.").

**B. The State Withheld Information Implicating a Third-Party Suspect.** Next, the Defendant argues that the State's delayed disclosure of the threatening voicemail messages constituted a violation of Brady. Although he concedes that he failed to request a continuance based on the late disclosure of the voicemail messages at trial, he argues that the State's late disclosure "did not cure the [Brady] violation."

This court analyzes the State's delayed disclosure of evidence differently than the State's non-disclosure of evidence. "Generally, if there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, Brady normally does not apply, unless the delay itself causes prejudice." State v. Caughron, 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting); State v. Joan Elizabeth Hall, No. 01C01-9710-CC-00503, 1999 WL 34782, at *9 (Tenn. Crim. App., at Nashville, Jan. 28, 1999) (citations omitted). Where there is a delayed disclosure of evidence, this court must determine whether the delay kept defense counsel from effectively using this evidence in presenting and preparing the defendant's case. Caughron, 855 S.W.2d at 548 (citing United States v. Ingraldi, 793 F.2d 408, 411-12 (1st Cir. 1986)). "Delayed disclosure results in prejudice to the defendant and may deny the defendant due process when it is 'too late for the defendant to make use of any benefits of

the evidence.'" State v. Sidney M. Ewing, No. 01C01-9612-CR-00531, 1998 WL 321932, at *8 (Tenn. Crim. App., at Nashville, June 19, 1998), opinion vacated and reentered by State v. Ewing, No. 01C01-9612-CR-00531, 1998 WL 485614, at *1 (Tenn. Crim. App., at Nashville, Aug. 18, 1998) (quoting Nassar v. Sissel, 792 F.2d 119, 121 (8th Cir. 1986)). An incomplete response to a Brady request might cause the defense to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." United States v. Bagley, 473 U.S. 667, 682 (1985) (citation omitted). If the defense fails to request a continuance after receipt of the evidence, fails to call or recall a witness to testify regarding the evidence, or fails to extensively cross-examine a witness regarding the evidence, the Brady violation may be cured. Sidney M. Ewing, 1998 WL 321932, at *9.

On the day the Defendant's trial began, immediately before the jury was sworn, the State said that it had an "evidentiary matter" concerning the voicemail messages to address with the court. While not entirely clear from the record, the State apparently moved the court to exclude the content of the voicemail messages from the trial based on hearsay. The defense argued, and the trial court agreed, that the content of the voicemail messages was admissible in order for the defense to establish the possibility of a third party suspect. The two voicemail messages, the content of which is transcribed below, were recorded on a disc, played for the jury, and admitted as an exhibit at trial during Investigator Vittatoe's testimony.

> First Message: Piece of sh--. N----- lover. F---ing 'ho. You're gonna f---ing die tomorrow because I am coming like a G-- damn hurricane. You won't believe what happens next. You and your G-- damn, f---ing n-----s is gonna die.

> Second Message: I'm gon' leave you one message. This is for the white person who left me. The G-- damn f---ing n---- shit is over. I am f---ing pissed off bad now. You have got to f---ing kill me to get rid of me . . . . I live at G-- damn 310 W. Summer Street. Bring it on. Don't f--- with me ever again. Leave my shit alone and quit f---ing with those G-- damn n-----s, Winna. You are a dead woman. You gonna die if you f--- with those damn n-----s. G-- damn. Jesus Christ, Winna. What are you doing? You left me for a n----? Don't you understand what I'm gonna do? Don't you understand what I'm gonna do? Don't you understand what's gonna happen to you? Goodbye.

As an initial matter, our review of the record does not bear out exactly when the voicemail messages were disclosed to the defense. At the motion for new trial, defense counsel could not recall when he received the recording and believed, based on his

experience with the State, that it was provided to him as soon as the State had received it. On the day the trial was to commence, the State moved to exclude the content of the recordings, and defense counsel properly objected. Defense counsel was not surprised by the motion to exclude the voicemail messages, did not move the court for a continuance based on late-disclosure grounds, and advocated for the admission of the content of the voicemail message as a critical part of their defense. At trial, defense counsel cross-examined Investigator Vittatoe regarding the content of the voicemail messages and whether he had investigated the identity of the caller. Investigator Vittatoe confirmed that he investigated Will Pressley, an acquaintance of the victim's, as the caller. Investigator Vittatoe said that Pressley died shortly after this offense and that he had discussed this information with defense counsel prior to trial. At the motion for new trial, defense counsel "did not know" whether receiving the recording of the threatening voicemail messages one week prior to trial "caused a hardship" or "prejudiced" his defense. Based on this record, to the extent there was late-disclosure of the recordings, the Defendant has failed to establish prejudice. While the Defendant argues in his brief that a voice analysis expert could have established the identity of the caller, he failed to put forth any proof at the motion for new trial hearing in support of this issue. His conclusory statements are not proof, and for purposes of this analysis, we are unable to engage in such speculation. Accordingly, the Defendant is not entitled to relief.

C. **The State Constructively Suppressed Exculpatory DNA Evidence.** Finally, the Defendant argues, without citing any authority, that the State violated Brady by suppressing exculpatory DNA evidence. Here, the Defendant is aggrieved because the State did not test certain items of evidence recovered in this case. In a novel argument, he claims that the "State's conscious ignorance for the truth, demonstrated in its failure to test the firearm, and the interior of the alleged perpetrator's pants, for any link to the defendant, can only be characterized as a Brady violation." We disagree. Brady obligates the State to disclose exculpatory evidence in its possession. See State v. Robinson, 146 S.W.3d 469, 512 (Tenn. 2004). To the extent that the Defendant claims that there is exculpatory evidence inside the FUBU pants, a Brady claim inherently requires that exculpatory evidence already exist. See State v. Brownell, 696 S.W.2d 362, 364 (Tenn. Crim. App. 1985) (noting that when "evidence does not exist, the State cannot be charged with suppressing it"). Here, it is clear by his amended motion for additional DNA testing of the FUBU pants that the exculpatory value of the evidence is yet to be determined. Moreover, the FUBU pants were made available to the Defendant for independent testing prior to trial, and, for reasons unknown, he declined to do so. Accordingly, the Defendant has not articulated a viable Brady claim, and he is not entitled to relief on this issue.

VI. **Ineffective Assistance of Counsel.** The Defendant argues that trial counsel was ineffective in failing to thoroughly investigate a third-party suspect and in failing to

call any defense witnesses. The Defendant alleges that this failure was based, in part, upon the limited resources and heavy caseload of the Public Defender's Office, which provided representation for the Defendant at trial. Ineffective assistance of counsel claims may be raised on direct appeal; however, this court has cautioned that this is a practice "'fraught with peril[.]'" State v. Amy Jo Blankenship, No. M2002-01878-CCA-R3-CD, 2004 WL 508500, at *3 (Tenn. Crim. App. Mar. 16, 2004) (quoting State v. Ricky Brandon, No. M2002-00073-CCA-R3-CD, 2002 WL 31373470, at *2 (Tenn. Crim. App. Oct. 15, 2002); State v. Blackmon, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001)). This is so because, "once the merits of an ineffective assistance of counsel claim have been addressed on direct appeal, the issue may not be revisited in a post-conviction proceeding." Id. (citing Bobby Allen Joyner v. State, No. 03C01-9807-CR-00260, 1999 WL 3188832, at *2 (Tenn. Crim. App. May 19, 1999)). Here, we glean from the record that this issue was included in the direct appeal due to the egregious delay in the resolution of the Defendant's motion for new trial and through no fault of counsel. At first blush, this may have been an expeditious way to proceed; however, the record reveals that this issue was prematurely raised and not adequately developed in the trial court. Therefore, upon our careful review, we dismiss the Defendant's ineffective assistance of counsel claim, without prejudice.

**VII. <u>Denial of the Defendant's Amended Motion for DNA Testing.</u>** Finally, the Defendant argues that the trial court erred by denying his motions requesting additional DNA testing. The Defendant filed a Motion for DNA Testing on August 22, 2013, and filed an amended motion on May 8, 2014. The motions asserted that, pursuant to the Post-Conviction DNA Analysis Act of 2001, the Defendant was entitled to DNA testing on several evidentiary items that could yield exculpatory DNA evidence. A non-evidentiary hearing, for which the Defendant was not present, took place on May 12, 2014. At the hearing, the State argued that the Defendant failed to establish the first of four factors necessary for mandatory DNA testing, which requires that "[a] reasonable probability exists that [the Defendant] would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing." See T.C.A. § 40-30-304(1). The State maintained that given the amount of convicting evidence introduced at trial, no reasonable probability existed that additional DNA analysis, even if favorable to the Defendant, would have changed the outcome of his conviction. After hearing arguments from counsel, the court orally denied the Defendant's Amended Motion for DNA Testing and subsequently issued a written order denying the motion on May 22, 2014. In its written order, the court agreed "that the Defendant ha[d] not met his burden under the first of the four factors required by Tenn. Code Ann. § 40-30-304." In finding that factor (1) was not satisfied, the court felt no need to address the remaining three factors. See T.C.A. § 40-30-304(2)-(4).

On appeal, the Defendant argues that the trial court improperly denied the Amended Motion for DNA Testing in violation of the Post-Conviction DNA Analysis Act ("Act"). Specifically, he maintains that the court failed to adhere to the ruling in Powers v. State, 343 S.W.3d 36, 55 (Tenn. 2011), which requires the court to presume that DNA testing would yield the most exculpatory results. He further contends that certain evidentiary items should be tested or retested given the technological advancements in DNA testing since the time of trial. The State responds that the Defendant has failed to show that the trial court abused its discretion by denying post-conviction DNA testing. Upon review, we find that the trial court abused its discretion by denying the Defendant's request for DNA testing.

The Act states that a petitioner convicted of specific offenses, including first degree murder, "may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence." T.C.A. § 40-30-303. There is no statute of limitation on filing a petition for testing, and "the right to DNA analysis under the Act may not be waived by implication." Powers, 343 S.W.3d at 48 (quoting Griffin v. State, 182 S.W.3d 795, 799 (Tenn. 2006)). Tennessee Code Annotated section 40-30-304 is mandatory, requiring that once the State has been provided notice and an opportunity to respond, the court shall order DNA analysis pursuant to the Act if it finds that:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
>
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
>
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
>
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

T.C.A. § 40-30-304. The Act also has a discretionary provision, which states that the court may order DNA analysis if it finds "[a] reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict

or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction," and the petitioner has satisfied the other three requirements. Id. § 40-30-305. Under both the mandatory and discretionary provisions, the petitioner must satisfy all four requirements before DNA analysis will be ordered by the court. See Powers, 343 S.W.3d at 48.

Regarding the first factor in section 40-30-304, the petitioner must show "a reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis." T.C.A. § 40-30-304(1). A reasonable probability is a probability sufficient to undermine confidence in the decision to prosecute or in the conviction had the State or the jury known of exculpatory DNA testing results." Powers, 343 S.W.3d at 55 (internal quotation marks omitted). Moreover, for this first factor, "we begin with the proposition that DNA analysis will prove to be exculpatory." Id. (citing Pervis Payne v. State, W2007-01096-CCA-R3-PD, 2007 WL 4258178, at *10 (Tenn. Crim. App. Dec. 5, 2007); Jack Jay Shuttle v. State, No. E2003-00131-CCA-R3-PC, 2004 WL 199826, at *5 (Tenn. Crim. App. Feb. 3, 2004)).

Because the trial court is given considerable discretion in determining whether the Petitioner should be granted relief under the Act, this court's scope of review is limited on appeal. Jesse Haddox v. State, No. M2003-00514-CCA-R3-PC, 2004 WL 2544668, at *2 (Tenn. Crim. App. Nov. 10, 2004) (citing Jack Jay Shuttle, 2004 WL 199826, at *4). Accordingly, we will not reverse unless the trial court's judgment is not supported by substantial evidence. Id. (citing State v. Hollingsworth, 647 S.W.2d 937, 938 (Tenn. 1983); Willie Todd Ensley v. State, No. M2002-01609-CCA-R3-PC, 2003 WL 1868647, at *4 (Tenn. Crim. App. Apr. 11, 2003)).

"While courts must also consider the evidence that was presented against the petitioner at trial, the evidence must be viewed in light of the effect that exculpatory DNA evidence would have had on the fact-finder or the State." Powers, 343 S.W.3d at 55 (citing Jesse Haddox, 2004 WL 2544668, at *5 ("A proper analysis by the trial court must include consideration of the effect of th[e] 'exculpatory result' on the jury.")). In addition, it may be proper to consider any stipulations of fact made by the petitioner or his attorney and the state. Id. (citing Mark A. Mitchell v. State, No. M2002-01500-CCA-R3-PC, 2003 WL 1868649, at *4 (Tenn. Crim. App. Apr. 11, 2003)). Moreover, in considering a petition for post-conviction DNA testing,

> the opinions of [the Court of Criminal Appeals] on either the direct appeal of the conviction or the appeals in any previous post-conviction or habeas corpus actions may provide some assistance. These sources provide the essential facts of the crime at issue and may be helpful to trial courts in

their assessment of the merits of any claim.

Mark A. Mitchell, 2003 WL 1868649, at \*4. However, "[t]he 'reasonable probability' inquiry under section 40-30-304(1) of the Act requires courts to look at the effect the exculpatory DNA evidence would have had on the evidence at the time of trial or at the time the decision to prosecute was made, not on the evidence as construed by an appellate court in the light most favorable to the State." Powers, 343 S.W.3d at 57.

The Defendant argues that Powers requires that "[t]he trial court must assume the most exculpatory results." He contends that "[i]n this case, the most exculpatory results would include the presence of Michelle Tolley's DNA . . . on the inside of the [FUBU] pants and under the victim's fingernails." According to the Defendant, had additional DNA testing yielded either of these results, it is "reasonably probable" that the jury would have acquitted the Defendant at trial. A similar argument was presented by the defense at the May 12, 2014 non-evidentiary hearing on this matter. In denying relief, the trial court rejected this argument and adopted the State's position, which the court summarized as follows:

> It is the State's position that, even if additional DNA is found on the above listed items and even if such evidence is viewed in the light most favorable to the Defendant, the Defendant would still have been convicted of first-degree murder because the totality of the evidence proves the Defendant's guilt. The State points to and cites the following evidence in the record in support of this argument: an eyewitness to the murder, who testified the Defendant killed the victim; the victim's blood/DNA were found on the Defendant's Fubu pants; the Defendant was found in possession of the victim's cell phone and the victim's car at the time of his arrest; the Defendant was in possession of the murder weapon (the .45 caliber handgun was a ballistic match to the gun used to kill the victim) at the time of his arrest; and the Defendant fled the County and the State after the murder.

We disagree. Viewed in the light most favorable to the Defendant, Tolley was the State's key witness. She was present at the time the victim was killed, and testified that the Defendant killed the victim. Scientific evidence demonstrating that Tolley was wearing the pants with the victim's blood on them and that Tolley's DNA was underneath the victim's fingernails is sufficient to undermine confidence in the decision to prosecute or the conviction. Therefore, in light of the totality of the evidence, we conclude that the Defendant has established that "[a] reasonable probability exists [that he] would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis." See T.C.A. § 40-30-304(1).

In addition, we conclude that, based on the record, the third and fourth factors set forth in Code, section 40-30-304 have been met. See id. § 40-30-304(3)-(4). Here, the items the Defendant seeks testing for were "never previously subjected to DNA analysis or [were] not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis." See id. § 40-30-304(3). Specifically with regard to the victim's fingernails clippings, the Defendant has sufficiently established that advancements in DNA testing could yield conclusive results that were unattainable at the time this evidence was previously tested. See Def.'s Am. Mot. to Order for Forensic DNA Testing, Kahn Aff. Ex. A, at 17, May 8, 2014 (stating that significant developments in DNA extraction techniques since the mid-2000's allow forensic analysts to obtain DNA profiles from smaller quantities of material that would previously return no result).[5] Moreover, we conclude that the Defendant has requested additional DNA testing in furtherance of his claim of actual innocence rather than to intend "to unreasonably delay the execution of sentence or administration of justice." See id. § 40-30-304(4).

However, based on the record before us, we are unable to conclude whether the second factor, that "[t]he evidence is still in existence and in such a condition that DNA analysis may be conducted" has been satisfied. Id. § 40-30-304(2). We note that the trial court was required to preserve all of the evidence in the State's possession that the Defendant listed in its request for DNA testing. See id. § 40-30-309. However, it is necessary to determine whether those existing evidentiary items are in such a condition that additional DNA analysis is achievable. Accordingly, we reverse the trial court's order denying additional DNA testing and remand this matter for the specific purpose of

---

[5] Attached as exhibits to the Defendant's amended motion for DNA testing area memorandum opinion and corresponding affidavit for the case of State v. Jeff Boppre, No. 35847 (Dist.Ct. Neb. Apr. 2, 2014) (mem. order). In the affidavit, Laura Gahn, Ph.D., a forensic analyst at Cellmark Laboratory in Dallas, Texas, attested, in pertinent part, to the following:

> We have also improved our ability to concentrate samples where there is only a small amount of genetic material. After late 2006, Cellmark began using the Amicon filter. This filter helps concentrate the genetic material that has been extracted, which improves our ability to obtain useful DNA profiles even from samples that may contain only a few skin cells. Likewise, where prior testing of small amounts of material only yielded a partial profile, using the Amicon filter to concentrate a sample can allow us to obtain a full DNA profile suitable for comparison. Cellmark has validated the use of the Amicon filter internally.
>
> . . . .
>
> I have been told that fingernail scrapings were taken from both victims at autopsy. . . . DNA testing of the fingernail scrapings is routine in such cases and can detect the DNA profile of the perpetrator from any skin cells or blood left behind.

determining whether the recovered FUBU pants and the victim's fingernails are in a testable condition. Upon an affirmative finding by the post-conviction court, we mandate entry of an order requiring DNA testing of the interior of the FUBU pants and for further testing of the substance recovered from underneath the victim's fingernails.

## **CONCLUSION**

We reverse the post-conviction court's order denying additional DNA testing and remand this matter for determination of Tennessee Code Annotated, section 40-30-304(2) with regard to the specific evidentiary items stated herein. Upon a finding that factor two is met, we order the entry of an order for additional DNA testing consistent with this opinion. We dismiss without prejudice the Defendant's prematurely raised claim of ineffective assistance of counsel. In all other respects, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE